AMERICAN THREAD COMPANY *vs*. MILO WATER COMPANY.

Piscataquis.     Opinion June 14, 1929.

*C. W. & H. M. Hayes*, for plaintiff.
*McLean, Fogg & Southard*, for defendant.

SITTING: WILSON, C. J., PHILBROOK, DUNN, DEASY, STURGIS, BARNES, BASSETT, PATTANGALL, JJ.

PHILBROOK, J.   Case on report. The plaintiff, herein designated as the Thread Company, is a manufacturing corporation having an established place of business at Milo, Maine. The defendant, herein designated as the Water Company, is a public utility furnishing a general water service, including fire protection service, in said town.

In addition to, and apart from its manufacturing plant, the Thread Company owned a certain parcel of real estate, with buildings thereon, situated in said Milo and locally called the Gubtill Farm. This farm property was on a street known as Park street and was approximately three thousand feet northerly from the northerly terminus of the Water Company's six inch service main on that street. The Thread Company desired the Water Company service at its farm and requested extension of the Park street main so as to furnish such service. This the Water Company declined to do on account of the heavy initial cost involved and lack of funds to defray such expense.

Thereupon, under date of June 17, 1920, the Thread Company wrote the Public Utilities Commission, briefly describing the situation, its desire for water service, the willingness of the Water Company to furnish the same, provided it could borrow the necessary capital to make the extension, and asking suggestion as to the manner in which the financial factor in the problem might be met. On June 28 the Commission wrote the Water Company to ascertain what the latter intended to do. To this letter, under date of June 30, the Water Company replied that their estimate of the cost of the extension of the Park street main, as requested by the Thread Company, would be approximately six thousand dollars,

which sum it would be impossible for the Water Company to borrow under existing conditions, and that it could do nothing definitely until the Commission should send an engineer to make an estimate of the value of the water plant and whether the Water Company would be entitled to an increase of rate. Under date of July 1, the Commission wrote the Thread Company that they had instructed their chief engineer to go to Milo and confer with the two interested companies, and suggested that the Thread Company take under consideration the proposition "of assisting in the proposed extension to the extent of taking bonds with a view of being reimbursed by the company under some form of contract to be approved by the Commission. This is only a suggestion and we would like to have you consider it. Undoubtedly a public hearing will be ordered in this case at which all interested parties will have opportunity to express their views to the Commission."

In accordance with the suggestions contained in this letter from the Commission, the parties, on July 24, submitted a tentative draft of a contract to the Commission for its examination. Replying the Commission stated that it had no objection to the contract but made some suggestions as to size of the proposed service pipe and modification of rates agreed upon by the parties to the end that those rates would comply with regulations against discrimination.

Up to this time the Commission had done no official act and these details are briefly sketched in as a background to the picture and to show, among other things, that the first suggestion of a contract came from the Commission and not from either of the parties.

On September 13 three copies of the contract, redrafted and duly executed by the parties, were sent to the Commission for approval, and on November 10, under the hand and seal of that Commission the contract was. officially approved, the decree containing the following: "The approval of the contract is subject to all conditions in the matters of rates, services and practices, and the Commission retains full regulatory powers and jurisdiction under the contract as now made or as it may be modified or renewed."

The instrument thus executed and approved bears date of August 31, 1920, and is the contract involved in this case. The outstanding provisions of the agreement are: (a) that the Thread

Company would at once enter upon the work of installing the necessary service main on Park street, with service tees as requested by the Water Company, and a hydrant at the terminal point of the extension; (b) that the Thread Company would keep an accurate record of the cost of this extension and render to the Water Company an itemized statement thereof; (c) that when the Thread Company was ready to receive water service it would make, execute and deliver to the Water Company a lease of the extension at an annual rental of $402.50; (d) that the Water Company should furnish service to the Thread Company at the following rates, viz., for hydrant service $37.50 per year, and for all other service used by the Thread Company $1.00 per day; (e) that the amounts paid by the Water Company as rental should be credited on the total cost of the extension with interest on said cost; (f) that when the principal sum representing the expense of making said extension, with interest, should be fully paid by such rental, or otherwise, the Thread Company would make, execute and deliver to the Water Company a good and sufficient bill of sale of the extension, and thereafter the Thread Company would pay for its water service the regular published tariff rate applicable to the service received by it; (g) that during the term of the lease the Water Company should keep the extension main in repair and might furnish service to other persons through said extension; (h) that subject only to the hydrant service being assumed and paid by the Town of Milo, the Thread Company agreed to accept and pay for service at its Park street property at the rates named in the contract until the initial cost, and interest hereon, were fully paid; (i) that readiness on the part of the Water Company to furnish service should be sufficient to charge the Thread Company at the rates specified in the contract.

The service main having been installed, the Thread Company, under date of November 1, 1920, executed the lease called for by the contract, the terms thereof being in harmony with the contract.

It should be here observed that on November 8, 1920, with consent of the Public Utilities Commission, the Water Company filed a schedule of rates made in harmony with the contract and the same were approved by the Commission. Rate schedules for service rendered to the Town of Milo, to business corporations, and to in-

dividual users of water, had been duly established before the contract with the Thread Company and lease of the extension by the same.

Under date of February 13, 1926, the Water Company filed with the Public Utilities Commission a complaint against itself, alleging that its then rates were unreasonable, insufficient and unjustly discriminatory, and asking for certain changes and increases therein. Public hearing on this complaint was held at Milo on October 20 and 21, 1926. At that hearing the Thread Company, the Water Company, and other patrons of the service rendered by the Water Company appeared and were represented by counsel. The decree of the Commission bears date of September 30, 1927. Only so much of the decree as affected the relations between the Water Company and the Thread Company are to be here discussed.

In its historical statement the Commission refers to the contract between the parties bearing date of August 31, 1920, under which the extension was made at a cost of $8,222.39, and, says the Commission, "was leased to the Water Company with the agreement that the title should pass to it when the Thread Company should have been reimbursed for its full cost. Since the time of such lease the Water Company has been furnishing its service to the American Thread Company at Gubtill farm at rates fixed in the contract."

The Commission found that additional revenue by the Water Company was needed, and with reference to contracts for service, including the one made by these parties on August 31, 1920, said that "The additional revenue requirements, and the increases in rates occasioned thereby, result in modifications of the several contracts herein referred to. The authority of the State through the agency of the Public Utilities Commission in Maine, to make such modifications is well settled," citing *In re Guilford Water Company*, 118 Me., 367; *In re Searsport Water Company* and *In re Lincoln Water Company*, 118 Me., 382.

The Commission found that "The status of the Park street extension, so-called, is described in the contract and fixed by its terms. This extension was made primarily for a particular customer who must pay such rates as, taken with the other revenue derived from the line, will be sufficient to support it without placing any addi-

tional burden upon the rest of the system." The minimum yearly charged for water furnished through the Park street extension, exclusive of the payment for two public hydrants, was fixed at $575.

On or about November 16, 1927, the Thread Company formally notified the Water Company that the former would not continue the use of water from the system of the latter, at the Gubtill farm, and requested that it be shut off. This was accordingly done about November 16 or 17.

In declining to accept further service from the Water Company, the Thread Company, through its attorney, wrote the Water Company stating, among other things, "The Milo Water Company is indebted to the American Thread Company, under the contract, approximately $7,300, which we are instructed to demand of you." Correspondence followed between attorneys for the two companies and in a letter dated November 30, 1927, the attorney for the Thread Company said "Among other things we claim that the contract and lease constitutes a loan of money on the part of our client, and a promise to pay in a certain way on the part of the Milo Water Company. We claim that the increase of rates of Water service to our client, being an amount largely in excess of what we can afford to pay, justifies us in declining to take the water and we believe that we can be made whole in no other way than to demand and receive the balance due on the money advanced by the American Thread Company."

Upon failure to pay, suit followed, the writ bearing date of January 17, 1928. The declaration contains two counts, one being indebtitatus assumpsit for materials and labor expended in the Park street extension; the other containing an extended recital as to the contract, the lease, the complaint addressed to the Public Utilities Commission, the decree of that body, and especially averring that "the said defendant has itself, by its said complaint against itself, and the prosecution thereof, made it impossible to pay its said debt to plaintiff in accordance with the terms of said contract; whereby and by reason whereof, the said defendant, on the first day of October, A. D., 1927, at said Milo, to wit at said Dover-Foxcroft, became liable, and promised the plaintiff to pay it said sum of $7,186.20, and interest thereon on demand."

The plaintiff concedes that in order to recover in this action it

must establish two propositions: (a) that the contract of August 31, 1920, and the lease of November 1, 1920, taken together, constitute a sale; (b) that the change of rates, made by the Public Utilities Commission on complaint of the defendant against itself, resulted in a change of the contract between the parties in such an important part as to render the contract voidable.

The rights and liabilities of the parties depend upon a special contract, the provisions of which having been already stated do not need repetition. The contract contains no taint of illegality. Since one of the parties is a public service corporation, it not only must have been known to and understood by both companies that the State, through proper statutory provisions, retained control as to certain elements of the contract, but that control was also plainly provided for in the approving decree of the Public Utilities Commission.

The Thread Company, acting under the obligations placed upon it by the contract, installed the extension, rendered a true account of the cost of so doing to the Water Company, and executed the lease called for by the contract. From the date of the lease to a date sometime in the month of November, 1927, a period of about seven years, water service was rendered by the Water Company and accepted by the Thread Company at the annual service rate fixed by the contract and lease, both parties being apparently mindful of and governed by the outstanding provisions of the contract above referred to as (h) and (i). The record does not disclose that during those seven years there was any suggestion by either party that the transactions of contract and lease constituted a sale, in any legal aspect, nor that title to the extension was transferred, or ever to be transferred, until the cost of extension, and interest had been fully paid, at which time the Thread Company was to execute the bill of sale called for by the contract.

On June 30, 1927, and on September 30, 1927, two events occurred which have important bearing upon the attitude of the parties toward each other, and are highly suggestive as to the reasons for their present controversy.

The Thread Company came into possession of the Gubtill farm some time in 1920. At that time it proposed to stock the farm and did so. It desired the water service for the purpose of providing

water for a large herd of cattle and hogs, and for protection of the property against fire. This farm was originally purchased and stocked for the benefit of another property owned by the Thread Company, known as the Lake View Mill. In August, 1925, this mill was closed, and the necessity or occasion for the existence of the farm practically ceased. The number of the herd was slowly diminished until June 30, 1927, when all the stock was disposed of by auction sale. The farm was closed, and with this closing and sale of stock the substantial reason for need of water simultaneously ceased. The event of September 30, 1927, refers to the fact and date of the decree of the Public Utilities Commission increasing the water rates to be paid by the Thread Company.

Prior to September 30, 1927, the record shows no claim by either party that the transaction of contract and lease constituted a sale of the extension, nor transferred title thereof to the Water Company.

Where a sale is of specific, identified chattels or articles appropriated by the seller to the fulfillment of the contract, the question as to when the title passes is primarily one of the intention of the parties, to be derived from the terms of the contract and the circumstances of the case. The parties may, by the express terms of the contract, fix the time at which the title shall pass, and ordinarily full effect will be given to such provisions as between the parties. But as the parties do not always stipulate in this respect, the courts, when called upon to determine when the title passes, must necessarily seek to arrive at the intention of the parties as evidenced by the circumstances and the otherwise indefinite expressions of intention. 24 R. C. L., 15, and cases there cited.

Title to personal property passes only when the parties intend it to pass. Whatever the language or conduct of the parties, the question remains — did they intend the title to pass. *Thomas* v. *Parsons*, 87 Me., 203. Passing of title is always a question of intention between parties, *Russell* v. *Clark*, 112 Me., 166; it is largely a question of intention gathered from circumstances, *Silver* v. *Moore*, 109 Me., 505; it always involves intention, *Bethel Steam Mill Co.* v. *Brown*, 57 Me., 17.

As bearing upon the intention of the parties, regarding transfer of title, it is important to note that when the cost of the extension,

with interest, was "fully paid in the manner aforesaid, or otherwise," the Thread Company agreed to "make, execute and deliver to said Water Company a good and sufficient bill of sale of said six-inch extension." Light is thrown on the words "or otherwise" by a later provision in the contract, that after January 1, 1921, the Water Company might make payment to the Thread Company for the extension "in cash." It seems quite clear that the intention of the parties, as to the completion of the sale or transfer of title to the extension awaited full payment of the cost of the same with interest thereon. This has not been done.

But in order to support its contention that the contract and lease constituted a sale, the plaintiff invokes *Gross* v. *Jordan*, 83 Me., 380; *Reynolds* v. *Waterville*, 92 Me., 292; *Richmond* v. *Miss. Mills*, 4 L. R. A., 413; and *Jinnings* v. *Amend et al*, 101 Kansas, 130; 165 Pacific, 845; L. R. A., 1917, F. 626.

In argument it says that the acts of the parties are important as tending to show the purpose and understanding of the parties at the time of entering into the agreement, and claims that the real purpose of the parties was to create the relation of debtor and creditor between the plaintiff and the defendant, to have the plaintiff construct the extension for the defendant, and take its pay in installments. To support its argument it quotes from the opinion in *Reynolds* v. *Waterville*, supra, but makes no reference to the three other cases cited. Courteous consideration of the brief of the learned counsel for the plaintiff, however, demands examination of each of his citations upon this point. -

*Gross* v. *Jordan*, supra, was a replevin suit brought against a deputy sheriff to recover possession of a butcher wagon which the officer had attached as the property of A who purchased the wagon from parties in Massachusetts, under an agreement made in that state, and termed a "lease of personal property." The so-called lease provided that the wagon was to be held by A, as the property of the lessor; that A was to pay a stipulated monthly sum for the use of the same, which payments were to be endorsed on the lease, and when the sums so paid aggregated a fixed sum the lessor would sell and deliver the wagon to A, and that until the aggregate sum was fully paid no title to the wagon was to be claimed or acquired by A. The right and title of the lessor had been transferred to

Gross and Briggs, residents of Maine, who were plaintiffs in the action.

By way of dictum our court remarked that if the contract had been made in this state, the paper called a lease would be a conditional sale of property, but upon authority of *Morris* v. *Lynde*, 73 Me., 88, the title to a chattel which is the subject of conditional sale can pass to the vendee, *in praesenti*, or *in futuro*, only by consent of the vendor unless a statute controlled the contract and changed the relations of the parties.

The legal issue upon which the decision rested in *Gross* v. *Jordan*, supra, was the effect of the statute of the state in which the contract was made. That Massachusetts statute provides that in conditional sales of personal property the vendee shall have a right of redemption by paying the amount due and unpaid with interest and charges, virtually the same right of redemption as exists in Maine in mortgages of personal property. In the Gross case, involving a purchase price of $150.00, only $15.00 remained unpaid. The plaintiffs became owners of the vendor's right in the wagon, and the defendant officer attached it as property of the vendee. The case was decided on the legal point that the officer was entitled to notice of the amount due on the quasi-mortgage claim, before the plaintiffs could maintain replevin against him, since the statute requiring notice of the amount of a mortgage claim before maintaining a suit against an officer who has attached the property, applies to an irregular mortgage such as the one there under discussion.

*Reynolds* v. *Waterville*, supra, involved fundamental elements so widely differing from the case at bar that the two cases are easily and necessarily differentiated. In that case, the defendant desired to erect a city building at a cost which would cause the liabilities of the municipality to far exceed its constitutional debt limit. By special act of the legislature, Chap. 523, P. and S. Laws of 1897, a so-called City Hall Commission was created. The act provided that the City of Waterville, when its city council so voted, might convey to this Commission, in trust, "its present city hall building in said Waterville, together with all buildings, additions and improvements existing on said city hall lot at the time of said conveyance, for the sole purpose of securing the payment of the

bonds issued under the provisions of section three of this act, and for no other purpose." The Commission was to hold the property "in trust for said purpose" until all bonds and coupons so issued were paid and the trust discharged. The bonds so issued were to be known as "Waterville City Hall bonds," the proceeds of the sale of such bonds to be exclusively used for the purpose of erecting a city building in the city of Waterville. The city was required to annually raise, by taxation, sufficient money to pay all expense of repairs, insurance and management of the building, together with an annual rental in a sum equal to the annual interest on the bonds issued and outstanding, and in consideration of such rental "the city of Waterville shall become the tenant of said building" with power to sublease or sublet any part of the same. The plans of the building provided for an amusement hall, or opera house, and was not to be used wholly and exclusively for strictly municipal purposes. The treasurer of the city was to be the treasurer, *ex officio*, of the Commission. The court held that the Commission was very little more than a passive trustee; that it was naked of all authority except in one respect and that was a formal medium through which the city could secure its debt to the bondholders; that the Commission was to be entirely under the control of the city; that there could be no tenancy in any true sense of the word since the city was both landlord and tenant; and that instead of leasing the property the city undertook to pay for it on the installment plan. Hence, in that case, the court properly held that no element of a lease existed, but the wide difference between the principles involved clearly shows that the decision in that case is by no means determinative of the case at bar.

To avoid prolonged discussion of the cases cited by the plaintiff, as above stated, it is only necessary to say that in *Richmond* v. *Mississippi Mills*, supra, the point applicable to the instant case is the following language of Mr. Justice Sandels: "The true meaning and effect of an instrument determine its character; . . . the meaning of the instrument is ordinarily gathered from the language in which it is couched because that is usually the best evidence of the intention of the parties to it."

This ruling is entirely in harmony with what we have already said with respect to intention to transfer title.

In *Jinnings* v. *Amend,* supra, the issue involved was the right to terminate a lease under certain circumstances, and again the intention of the parties, under the instrument, was an outstanding issue.

While technically the form of the second count may not be sufficient to permit a recovery for a breach of the contract, the case was fully heard and evidence of the entire transactions between the parties introduced upon which the plaintiff's claim of a breach of the contract by the defendant is now based. On report, technical questions of pleading may be treated as waived. *Whitman* v. *Allen,* 123 Me., 1. Upon any view of the case no breach of the contract by the defendant is shown.

This is not a case of a conveyance of property upon a continuing consideration later held to be invalid under the regulatory or police powers of the state, or a grant of right or privileges, not for a definite sum, but in consideration of the furnishing of a service by a utility permanently or for a definite period at existing rates which were later changed by the rate-making power of the state, so that the grantor may be held to have been deprived of property without just compensation and due process of law as in *Low* v. *Railroad Com.,* 14 A. L. R., 249; *N. Y. Cent. R. R.* v. *Gray,* 239 U. S., 583; *Louisville & N. R. R. Co.* v. *Crowe,* 156 Ky., 27; but an agreement for a conditional sale of property for a fixed sum to be paid for by the utility in service which the grantor agreed to take until the property was paid for, at rates fixed in the contract, the property to be conveyed when the rates for the service totaled the sale price agreed upon. Such a contract must be held to have been entered into with the understanding that the rates fixed by the parties were subject to change by the rate-making power of the state. *Guilford, Searsport and Lincoln Water Co. Cases,* 118 Me., 367, 382. A change in the rates, therefore, even though made on complaint of the defendant, can not be held to constitute a breach of its contract which would warrant the plaintiff in rescinding with the right to recover the value of the property as contended in this action. *Northern Pac. Ry. Co.* v. *St. Paul & Tacoma Lumber Co.,* 4 Fed. (2nd Series), 359; *Union Dry Goods Co.* v. *Geo. Pub. Utilities Corp.,* 248 U. S., 372. The effect of the increase in rates, even if the plaintiff is required under its contract to con-

tinue to take the service, is not to compel the plaintiff to accept a less amount for its property than that fixed by the contract. It agreed to accept a service in payment, which the Public Utilities Commission found by reason of changed conditions was worth more than at the inception of the contract.

There having been no transfer of the title to the pipe line or breach of the contract by the defendant, the mandate in this case must be

*Judgment for the defendant.*